Filed 10/5/21  P. v. Cousin CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B307746 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.BA462241) |
| v. | |
| WYAUNTE COUSIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Kennedy, Judge.  Affirmed.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Stephanie A. Miyoshi and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Wyaunte Cousin of four counts of rape and one count of robbery against victims Emily and Debra.[1]  Appellant raises multiple issues on appeal.  First, he contends the court erred in admitting Debra's preliminary hearing testimony based on a finding that she was unavailable as a witness pursuant to Evidence Code section 1291 after she refused to testify at trial.  Second, he argues that the court improperly instructed the jury using CALCRIM No. 1191B regarding his propensity to commit sexual offenses.  Third, he challenges the admission of testimonial hearsay statements made by the victims during their sexual assault examinations. Fourth, he asserts that his sentence was unconstitutional and failed to consider his youth as a factor in mitigation.  We conclude appellant has not established prejudicial error.  We therefore affirm.

**PROCEDURAL HISTORY**

On September 13, 2018, appellant was charged by information with four counts of forcible rape, two each against Debra and Emily (Pen. Code, § 261, subd. (a)(2); counts one through four),[2] and two counts of second degree robbery, one each against Debra and Emily (§ 211; counts five and six).  The information further alleged as to the rape counts that appellant was convicted of committing a specified sexual offense against more than one victim (§ 667.61, subds. (b), (e)(4)), and that he

---

[1] We refer to the victims and civilian witnesses by their first names to protect their privacy interests.  (Cal. Rules of Court, rule 8.90(b).)

[2] All further statutory references are to the Penal Code unless otherwise indicated.

personally inflicted great bodily injury in the commission of the rape counts against Emily (§ 667.61, subds. (a), (d)(6)).

On April 22, 2019, the jury found appellant guilty on all four rape counts and the robbery count as to Debra (counts one through five). The jury further found the special allegations true. The jury acquitted appellant of count 6, the robbery charge against Emily.

Because the jury found true the allegations under section 667.61, appellant was sentenced on counts one through four pursuant to the "One Strike" law, an alternative, harsher sentencing scheme that applies to specified felony sex offenses. (*People v. Anderson* (2009) 47 Cal.4th 92, 102; § 667.61.) The court sentenced appellant to a total of 70 years to life plus 16 years in state prison, as follows: 25 years to life on count three pursuant to section 667.61, subdivisions (a) and (d)(6), 15 years to life as to each of counts one, two, and four, pursuant to section 667.61, subdivisions (b) and (e)(4), to run consecutively to count three, and one year on count five. The sentence also included a 15 year sentence for an unrelated charge.[3] Appellant timely appealed.

---

[3] In 2016, appellant pled no contest to an unrelated carjacking (§ 207(a)) and was sentenced to 15 years in prison. Pursuant to section 1170.1, subdivision (a), the court here pronounced a single determinate term of 16 years, combining the one-year sentence imposed in this case and the previously-imposed 15-year term.

# FACTUAL BACKGROUND

I. *Prosecution Evidence*

    A. *Rape of Emily*

        1. *Emily's testimony*

Emily testified that at the time of the incident in April 2016 she was 19 years old and homeless, sometimes "bouncing . . . from house-to-house," and sometimes living on the streets. Around 9:20 p.m. on April 26, 2016, she was outside a Kentucky Fried Chicken restaurant in the city of North Hills, sending a text message to her friend Rajon. She messaged Rajon that she wanted to "get high and just hang out." She had methamphetamine with her, but did not have a pipe.

As she stood outside the restaurant, appellant drove up in a white SUV and parked next to her. Appellant got out of the car and went into the restaurant. When he came out, he asked Emily her name. Emily responded that it was "Milli." Appellant said, "I remember you. I had met you before." Emily said she did not recognize him, and appellant responded that he met her "with Rajon and Rajon's uncle." Emily testified that she began to trust him a bit more after he correctly identified her friend Rajon, even though she did not recall meeting him before. Appellant asked what she was doing and Emily said she was trying to get high but did not have enough money to buy a pipe. Appellant told her "I have the rest that you need. Let's go."

Emily got into the front passenger seat of appellant's car and they drove a few blocks to a gas station, where appellant bought a pipe. Next, they parked in a parking lot and smoked methamphetamine. Afterward, appellant continued to drive them around, ignoring Emily's repeated suggestions to drop her off.

4

Appellant drove into an industrial area, pulled over, and asked to smoke out of the pipe again. Emily received a message on her phone from Rajon and she responded, telling Rajon that she was "with some guy you know," but was "trying to go" and wanted to "meet up right now." She told appellant that Rajon was at a nearby park, and appellant agreed to take her there. Emily texted Rajon she had been repeatedly asking appellant to leave, and that he was supposed to drop her off. The prosecution introduced Emily's text messages with Rajon at trial.

Emily testified that at some point she realized that appellant "was not going to drop me off or—any time soon." She told appellant, "You are on like some other shit," and opened the door to leave. Appellant grabbed her wrist and said, "close the fucking door, bitch." Emily testified that she was very scared and recalled "kind of just going into survival mode, kind of just going along with it." She closed the car door and appellant hit her on the left side of her face. After that, appellant grabbed her by the neck and began squeezing hard. She felt like "my whole face was on fire, and it felt like it was going to explode." She tried to scream but "no air was coming in. No sounds were coming out." She started to kick and then lost consciousness. When she woke up, her pants were pulled down and appellant had his penis in her vagina. She started crying and saying "this is the worst thing that's ever happened to me," over and over. Appellant said, "Stop crying, bitch. It's weird."

Appellant told Emily to go into the backseat of the car, but she could not move her body. Appellant moved her onto the backseat on her stomach. He followed her, reinserted his penis and began raping her again. Emily recalled crying and telling appellant, "Please don't kill me." Appellant told her he would not

5

kill her if she did not tell anyone. She estimated that he continued to rape her in the back seat for "at least an hour." After he stopped, she told him she needed to get out of the car. Appellant noticed that she had blood on her face, and said, "I don't know why you have blood on your face; I didn't hit you." Emily wiped her face and then appellant said she could go. Emily got out of the car, leaving behind her phone, a phone charger, and one of her shoes. Appellant immediately drove away.

Emily estimated she was unconscious for about an hour during the assault, because she could see her watch when appellant moved her to the back seat. After appellant drove away, she ran to a nearby apartment of an acquaintance. There, she took a shower and borrowed some clothing. She did not attempt to call the police because of the threats from appellant. She called her father and told him what happened. She asked him to pick her up.

Her father arrived at the apartment with the police. She asked if she could answer their questions inside her father's car, because she was scared appellant would drive by and see her. She told the police that she was smoking weed, rather than methamphetamine, because she did not want to get in trouble with her father. Otherwise she told the truth.

Emily went to the hospital and then to a rape clinic for a sexual assault examination. She testified that following the incident, she experienced a lot of pain in her tongue, neck, and head. At trial, she identified several photographs of her injuries taken at the rape clinic a few hours after the assault. She explained to the jury that she had red marks on her cheek and lip, her face was swollen, her neck was bruised, and that the

whites of her eyes were red from appellant hitting and strangling her.  She also discussed a photograph showing that her tongue was swollen and bruised.  She identified a photograph of the sweater she was wearing, which had blood on the neckline and shoulder, and her pants; she noticed after she regained consciousness in appellant's car that her pants were a little wet, but she did not know why.

While she was at the clinic, she used the clinic's computer to send a message to Rajon, telling him:  "He choked me out when I tried to leave.  I can't even begin to explain.  He fucking raped me, dude.  He choked me.  I couldn't fucking breathe, and I tried to fight back.  I broke his window, but I woke up an hour later and the bitch was fucking raping me.  I was crying, dude.  I couldn't move."  She testified that appellant told her during the assault that she had cracked his windshield, and she thought it must have happened when she was kicking before passing out.

Emily met with Rajon a few days later and gave him a description of her assailant and his vehicle.  Rajon said that description matched someone with the nickname "Junkyard Dog."  As they talked further, Emily recalled briefly meeting appellant about four or five months before at a gathering with friends.

A few months later, Emily identified appellant from a photographic lineup as looking similar to her assailant. In August 2017, Emily spoke to the police again while she was in a rehabilitation facility.  She admitted to smoking methamphetamine rather than marijuana at the time of the assault.

2.      *Guy and Rajon*

Emily's father, Guy, testified that she called him between

7

2:00 and 2:30 a.m. on April 27, 2016.  She was crying, told him she had been raped, and asked him to pick her up.  Emily did not want to call the police, but Guy called 911.  Then he went to pick Emily up.  He testified that when he saw Emily, she was walking slowly, shaking, and crying.  The whites of her eyes were a deep red, she had red bruises and scratches on her neck, and her tongue was swollen and discolored, making it difficult for her to talk.

The prosecution played the recording of Guy's 911 call at trial.  Guy told the operator that Emily had called him and said she had been raped and choked.

Rajon testified that he was texting with Emily on April 26, 2016 around 9:30 p.m. because they were trying to meet.  At one point, she stopped responding.  Then, around 5:00 a.m. the next morning, he got another text from Emily saying she had been raped.  He met with Emily about 10 to 12 hours later, and she described her assailant.  From that description, he thought it was "Junkyard Dog," whom he identified in court as appellant.  Rajon had also seen appellant in the area in a white SUV, the day before or the day of the assault.  Rajon testified that he met appellant twice through Rajon's uncle.  He recalled seeing appellant meet Emily once, briefly, a couple of days prior to the assault.

### 3. *Investigation*

Officer Lance Novak of the Los Angeles Police Department (LAPD) met with Emily at her friend's apartment. He described Emily as "visibly upset," shaken, scared, and looking like "she had been beaten up."  Her eyes were so bloodshot that "you couldn't see the whites of her eyes, more or less."

8

The police took Emily to a clinic in Northridge for a sexual assault examination. Novak observed remotely while Emily was interviewed by medical personnel. He confirmed that the statements Emily gave the nurse were "the same general story" she had given him.

Marilyn Stotts, a nurse practitioner, performed the sexual assault examination on Emily at the Northridge Center for Assault Treatment Services. Emily reported to Stotts that she had ingested marijuana within the past 72 hours and showered after the attack. Emily estimated losing consciousness for an hour during the assault. She reported pain in her tongue, mouth, neck, and shoulder. Emily told Stotts that appellant strangled her and hit her in the jaw. Stotts noticed that Emily had injuries consistent with strangulation, including the scleral hemorrhages in both eyes (resulting in reddened whites of the eye), as well as injuries to her clavicle and neck, and a cluster of bruising on her arm about the size of fingerprints. Stotts also noted bruising, punctures, and swelling on Emily's tongue. Stotts opined that strangulation could cause a seizure, which would be consistent with Emily's tongue injuries if she bit her tongue while seizing. She also noted cuts and abrasions to Emily's genitalia.

Stotts opined that the injuries she observed were consistent with the report Emily gave. She also noted some wetness in the underwear and pants Emily was wearing at the time of the assault. Stotts did not know whether it was urine, but testified that loss of bladder function could occur after about 15 seconds of strangulation.

LAPD Detective Esther Myape met with Emily at the rape treatment clinic on April 27, 2016. Myape testified that Emily was exhausted, upset, and crying. Two months later, Emily

identified appellant from a six-pack photographic lineup  The vaginal swabs taken from Emily during her sexual assault examination contained semen that matched appellant's DNA.

### B.    *Rape of Debra*

#### 1.    *Debra's testimony*

Debra testified at the preliminary hearing on August 30, 2018 and her testimony was read at trial.  Debra testified that she was 18 years old at the time of the incident on April 28, 2016.  That evening, she was working as a prostitute at the corner of Figueroa and Manchester in Los Angeles.  As she walked down the street, appellant pulled up alongside her in a small white Jeep and offered her $100 for a "date."  Debra got into the front seat of the car and appellant began to drive.  She noticed a tattoo on the right side of his face.

After driving for some time, appellant pulled into an alley.  He parked the passenger side of the car against a fence, which made Debra uncomfortable because she was unable to get out of the car.  She asked him for the money and he laughed and said he did not have any money.  Debra testified that she tried not to panic, and asked him, "So are you going to rape me?"  He responded, "I'm going to rape you."

Appellant told Debra to get into the back seat of the car and she complied because she was "already stuck."  As she did so, she took off her long acrylic nails because "I was going to fight him."  Appellant followed into the backseat and began trying to choke Debra.  She tried to push him off of her.  Appellant then punched her in her left eye so hard that she was "out.  I just took – I laid there."  Debra started to cry and appellant kept telling her to shut up.  She asked him to put on a condom but he refused.  He then inserted his penis into her vagina.  Debra testified that

10

she was afraid he would kill her if she fought back. After a few minutes of raping her, appellant ejaculated inside her, then fell asleep on top of her. She could not move with his weight on her. After a few hours, he woke up and put his penis inside her vagina again. Debra began to cry again and then she threw up. Appellant made her clean it up. Afterward, he asked her, "Are you going to tell on me? . . . . Because if you are, then let me know, so I could kill you now." Debra said she would not. Appellant took $20 out of her purse and also read her name aloud from a card in her purse. He also took her cell phone.

Appellant let Debra out of the car and drove away. She tried to see his license plate but could not, because her eye was "all fucked up." Debra got on the bus to go home. A woman came up to her on the bus and asked what was wrong. Debra told her that she had been assaulted. The woman called the police and told Debra not to disclose that she was a prostitute "because if you tell them that, they won't help you."

When the police arrived, Debra did not tell them she had been working as a prostitute. Instead, she said that "some guys kidnapped me."

### 2. *Investigation*

LAPD officer Cody Silva responded on April 28, 2016 to the 911 call regarding Debra. She spoke to a witness, Akeisha, who said that she had called 911 for Debra. Officer Silva also spoke to Debra, and noticed that she was crying, extremely upset, and that her left eye was swollen. Debra told Silva that she had been forced into a car by two men.[4]

---

[4] After both victims identified appellant as the assailant, the cases were coordinated. Detective Myape interviewed Debra

Amy Adler is a nurse practitioner at the rape treatment center in Santa Monica. She conducted a sexual assault examination on Debra on April 28, 2016. Adler testified that when Debra arrived, her left eye was swollen shut. The area around her eye was swollen, bruised, and tender and she complained of pain on the left side of her face. Debra reported vomiting twice during the assault. Debra also said that the assailant hit her in the face and threatened to kill her. Debra reported three instances of penile-vaginal penetration; Adler testified that Debra had an abrasion and tenderness in her vaginal area. Adler opined that her examination findings were consistent with Debra's statements regarding the assault.

LAPD detective Irma Castillo was the primary investigator for Debra's case. Castillo testified that when she met with Debra following her sexual assault examination, Debra gave a description of the suspect and told her that the assailant had kept her cell phone. The next day, April 29, 2016, detectives tracked the phone's GPS and located appellant, who matched the description given by Debra, including facial tattoos. Appellant had Debra's cell phone in his pocket. LAPD officers brought Debra to the location where they had detained appellant. She identified him as her assailant and the police arrested him. Testing of the genital swabs taken from Debra during her sexual assault examination detected semen matching appellant's DNA.

II.    *Defense Evidence*

Appellant did not present any affirmative evidence at trial.

---

in October 2017, and Debra admitted she was working as a prostitute on the evening of the assault and was not kidnapped as she initially reported.

## DISCUSSION

I.        *Admission of Debra's Preliminary Hearing Testimony*

Appellant contends that the trial court improperly found Debra unavailable for trial and thereafter admitted her preliminary hearing testimony. He argues that the use of this testimony violated his rights to due process and confrontation. He also argues that, at a minimum, the court should have found Debra to be "infirm" and ordered a conditional examination pursuant to section 1336. We conclude the court properly admitted the testimony.

A.        *Background*

Debra testified at the preliminary hearing on August 30, 2018, as detailed above, and defense counsel cross-examined her. Defense counsel's questions focused on the defense theory that appellant and Debra engaged in consensual sex and appellant then refused to pay her the agreed-upon amount.

The parties presented opening statements at trial on April 15, 2019.  On April 17, in the middle of the prosecution's case, the prosecution moved to admit Debra's preliminary hearing testimony under Evidence Code sections 240 and 1291.  The prosecution reported that Debra had been a cooperative witness until April 15, when she refused to be transported to court and stated she did not want to testify or see appellant again.  She subsequently refused all further efforts at contact.

The court held a due diligence hearing on April 17, 2019, at which the prosecution presented multiple witnesses.  Detective Myape testified as the investigating officer currently assigned to Debra's case.  On April 5, she served Debra with a subpoena for a court appearance on April 9, 2019.  At the time, Debra was cooperative, as she had been since the beginning of the case, and

13

appeared to be willing to come to court.  It turned out Debra was not needed that day, so Myape made arrangements to meet with Debra on April 15 to prepare for her trial testimony.  Debra agreed to be picked up by Detective Jeffrey Allen and driven to the courthouse for the meeting.  Myape sent her a reminder on the day of the meeting.  She got no response, which was unusual, as Debra always responded quickly to texts and calls.

On April 15, at the time of the planned meeting, Myape asked Christine Von Helmolt from the sex crimes division in the District Attorney's office to meet Debra at the courthouse.  Von Helmolt testified that Detective Allen called her around 3:00 p.m. from Debra's apartment and advised that Debra was not willing to come with him to court.  Von Helmolt spoke with Debra over the phone; Debra stated that she was having child care issues and family problems, that "she wasn't willing to come, that she wasn't feeling it, and she wasn't going to come."  Von Helmolt testified that she offered "a number of solutions to the problems [Debra] presented," including providing child care, meeting with a victim advocate to discuss services for her family problems, and assuring Debra that all she had to do that day was review the preliminary hearing transcript in preparation for trial.  Debra responded "very negatively.  She kept insisting that she is not feeling it.  She's not coming."  In the middle of this conversation, Debra handed the telephone back to Allen, refused to talk further, and refused to go with him.

After court proceedings that day, Myape went to Debra's residence.  Myape testified that she arrived around 7:00 p.m. and Debra answered the door.  Debra told Myape that she did not want to come to court and slammed the door. Myape spoke through the door for several minutes, trying to reassure Debra

14

that "I wanted to talk to her about what was going on with her; that I could help her." Debra opened the door again, started crying, said she did not want to be on the stand testifying again, and "she did not want to be in the same room with the defendant again. She didn't want to look at him." Debra said she had already testified once and did not understand why that was not enough. Myape gave her some cupcakes she had brought and a subpoena to appear the next day, April 16. Debra took them and closed the door.

Myape texted Debra later that night that she was concerned about her and what she was going through, and offered to take her to talk to a victim's advocate the next morning. There was no response. The next morning, she went to Debra's residence and was informed by the security guard that Debra had just left. Myape called and texted Debra but received no response. She also went to the daycare where Debra took her child. She saw Debra's child there, but did not see Debra. Myape asked the apartment building security guard to call if Debra came home. She received a call from the guard around 10:00 a.m. and sent Detective Danetta Menifee and her partner to the apartment.

Detective Menifee testified that she and her partner went to Debra's residence around 11:00 a.m. on April 16 to try to make contact. They knocked on Debra's door and could hear a TV on inside, but there was no answer. Menifee also called Debra's phone several times, but there was no answer and no voicemail.

Detective Castillo, the initial investigating officer on Debra's case, also went to Debra's residence on April 16 to try to convince her to come to court. She testified that she and another detective arrived around 1:30 p.m. The security guard directed

15

them to Debra's apartment and said that Debra was home. Castillo knocked on the door for about 15 minutes and heard the television volume increase, but no one answered the door. They found out from the security guard that the apartment did not have a landline. They also contacted the building manager; he provided the phone number for Debra's stepfather, who lived with Debra. Castillo called and spoke with the stepfather, who was not home at the time, and asked him to contact Debra and have her come to the door. He refused, stating that "Debra did not want to come to court." Castillo testified that she continued speaking to him for several more minutes and finally persuaded him to ask Debra to come out of the apartment to speak to Castillo in person. Castillo went back to the apartment and knocked again, calling out to Debra to come out and speak with her. No one came out. The detectives left around 2:30 p.m. Castillo also called Debra's phone five times and left messages, and left her business card at the apartment. She never received any response from Debra.

Detective Menifee and her partner returned to Debra's residence around 5:00 p.m. on April 16, hoping to catch Debra when she left the building to pick up her child from the daycare facility. They did not see Debra and there was no answer on her phone. They also went to the daycare facility and spoke with an employee. The employee reported that Debra should arrive prior to their closing time at 6:00 pm. Menifee and her partner waited; later, they saw a man leaving the daycare with a child matching the description for Debra's child. They followed the man and child back to Debra's apartment, where they saw Debra's stepfather in the lobby. The stepfather complained that the detectives were harassing him and Debra, and that Debra did not

want to testify. Menifee explained how important Debra's testimony was, but the stepfather repeated that Debra did not want to testify, and if that meant appellant "gets out of prison, he gets out of prison." Menifee had no further contact with Debra or her stepfather after that.

Detective Myape texted Debra at the end of the day on April 16, informing her that the court had issued a bench warrant for her appearance, but was holding it until the following day, so Debra had another chance to come to court. Myape again offered Debra transportation. She also sent the message to Debra's stepfather. She received no response to either text message.

Gregory Hernandez, an investigator for the District Attorney's office, testified that he arrived at Debra's residence around 6:00 a.m. on April 17, waited outside for about 30 minutes, then knocked at her door. There was no response. He waited in the hallway for another 35 minutes, then saw Debra's stepfather, who reluctantly agreed to get Debra from the apartment. When Debra came out, Hernandez explained that it was important for her to come to court. Debra stated that she did not want to go to court. Hernandez recorded this encounter and the prosecutor played the video of this exchange during the due diligence hearing.

The court then heard argument on the due diligence issue. The prosecutor pointed out that Debra had previously been cooperative, attended the preliminary hearing, and maintained contact with the detectives. The prosecution knew where Debra lived and properly served her with trial subpoenas. Thus, she argued that the prosecution had not failed to secure Debra's attendance; rather, the issue was "a question of her not wanting

17

to testify here in court." She also argued that Hernandez, "if authorized, could have arrested her this morning and brought her before the court. However, the court would be powerless to compel her to testify."[5] The prosecutor contended that Debra had made it very clear that she did not want to be in court, "to be in the same room as the defendant and to testify again. There really is nothing else we can do to compel her to come to court and testify."

Defense counsel responded that the evidence "indicates that [Debra] probably is suffering from a post-traumatic stress syndrome as a result of the rape. And I think that arguably one could argue that that makes her mentally infirm." Defense counsel argued that the court should order a conditional examination pursuant to section 1335. The court disagreed, stating that "a conditional examination is one that occurs basically prior to a trial. It usually takes place in a courtroom, not in some remote place. And it's video-taped and recorded. The jury is not here . . . . But the defendant is present. . . . It's not something that you do during a trial." The court also found that defense counsel was not qualified to offer an opinion regarding whether Debra was suffering from post-traumatic stress. The court continued: "I'm certainly not prepared to reach a diagnosis about the witness or to make a determination that she is mentally infirm. [¶] So I just don't see how this conditional

_____

[5] Code of Civil Procedure section 1219, subdivision (b) provides: "Notwithstanding any other law, a court shall not imprison or otherwise confine or place in custody the victim of a sexual assault or domestic violence crime for contempt if the contempt consists of refusing to testify concerning that sexual assault or domestic violence crime."

18

examination has application to the situation that we're in now." The court agreed with the prosecution that even if Hernandez forcibly brought Debra to court, "I cannot find her in contempt, nor could I imprison her for not testifying. . . . [¶] So I don't really know what reasonably could be done."

Defense counsel reiterated that appellant's rights could be protected by having a conditional examination. The court responded that "there is no conditional examination. We are in trial." The prosecutor pointed out that even with a conditional examination, appellant would be present, and that Debra "made clear to Detective Myape that she does not want to be in the same room as the defendant, nor does she want to talk about the assault again." Defense counsel suggested that appellant "could have waive[d] his presence" at a conditional examination. The court asked "are you suggesting now that your client is willing to waive his presence . . . so that she could testify in front of the jury? Are you really suggesting that?" Defense counsel said no.

The court concluded "that the prosecution has exercised due diligence" to secure Debra's presence, but that she was unavailable as a witness. Accordingly, the court allowed the prosecution to read the transcript of her testimony from the preliminary hearing.

B.    *Analysis*

The state and federal constitutions afford a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) That right is not absolute, however; under certain circumstances, the prosecution may introduce a witness's out-of-court statements at trial. (*People v. Herrera* (2010) 49 Cal.4th 613, 621 (*Herrera*).) Evidence Code section 1291 sets forth the requisite

19

circumstances. Under that statute, a witness's prior testimony is not rendered inadmissible if (1) "the declarant is unavailable as a witness," and (2) the "party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a)(2).) Here, appellant contends the prosecution did not establish the first element.

A witness is unavailable when he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5); see also *People v. Valencia* (2008) 43 Cal.4th 268, 291-292 [in determining due diligence "California law and federal constitutional requirements are the same."].) To establish the exercise of reasonable or due diligence and unavailability, "the prosecution must show that its efforts to locate and produce a witness for trial were reasonable under the circumstances presented." (*Herrera, supra*, 49 Cal.4th at p. 623.)

There is no "'mechanical definition'" of reasonable diligence; the term "[r]easonable diligence, often called 'due diligence' in case law, 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.'" (*People v. Cogswell* (2010) 48 Cal.4th 467, 477 (*Cogswell*); *People v. Cromer* (2001) 24 Cal.4th 889, 904 (*Cromer*).) "A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial." (*Herrera, supra*, 49 Cal.4th at p. 622, citations omitted.) "'The length[ ] to which the prosecution

20

must go to produce a witness . . . is a question of reasonableness.' The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.'" (*Ibid*.)

We "'defer to the trial court's determination of the historical facts of what the prosecution did to locate an absent witness,'" and "'independently review whether those efforts amount to reasonable diligence sufficient to sustain a finding of unavailability.'" (*People v. Thomas* (2011) 51 Cal.4th 449, 503.) Applying this mixed standard of review, we conclude that the trial court did not err in finding that the prosecution exercised reasonable diligence to produce Debra.

Appellant contends that the trial court should have taken further steps to assess Debra's willingness to testify, including bringing her to court despite her express refusal. We find *Cogswell, supra,* 48 Cal.4th 467 on point. There, the victim, Lorene, was visiting California from Colorado when she was sexually assaulted by Cogswell. She testified at the preliminary hearing, but refused to return to California for trial. (*Id.* at p. 471.) The prosecution sought to compel her attendance through a process set forth in the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases (§ 1334 et seq.) (Uniform Act), under which a Colorado court issued a subpoena to the victim. (*Cogswell, supra*, 48 Cal.4th at p. 472.) The victim refused to appear at trial and the prosecutor explained to the court that the victim had said "that she has had as much of this matter as she can possibly handle. . . . And she has emotional issues with coming back here to court." (*Id.* at p. 473.) The trial court declared her unavailable and permitted the prosecution to introduce her preliminary hearing testimony.

21

(*Ibid*.)

The Court of Appeal reversed, finding that to establish reasonable diligence, the prosecution was required to use the provision of the Uniform Act allowing the court to detain and transport the victim to California. (*Cogswell, supra*, 48 Cal.4th at p. 474.) The Supreme Court disagreed, concluding that the prosecution had used reasonable diligence in attempting to obtain the witness's presence at trial. (*Id*. at p. 473.) The court held that Code of Civil Procedure section 1219, subdivision (b) did not prohibit the prosecution from invoking the Uniform Act's "custody-and-delivery provision," but conversely, the prosecution was not *required* to do so before it could establish due diligence. (*Id*. at pp. 476-477.) The court reasoned, "To have a material witness who has committed no crime taken into custody, for the sole purpose of ensuring the witness's appearance at a trial, is a measure so drastic that it should be used sparingly. (See, e.g., *State v. Reid* (1976) 114 Ariz. 16, 559 P.2d 136, 145 ['Confinement of a witness, even for a few days, not charged with a crime, is a harsh and oppressive measure which we believe is justified only in the most extreme circumstances.'].) Confinement would be particularly problematic when, as in this case, the witness is a sexual assault victim." (*Cogswell, supra*, 48 Cal.4th at p. 477–478.) The court identified potential concerns, including that "sexual assault victims are particularly likely to be traumatized because of the nature of the offense," and that "[e]ven fewer such crimes would be reported if sexual assault victims could be jailed for refusing to testify against the assailant." (*Id*. at p. 478.)

The *Cogswell* court thus concluded that "the prosecution acted reasonably when it chose not to request—even though permitted under the Uniform Act's custody-and-delivery

22

provision—to have sexual assault victim Lorene taken into custody and transported from Colorado to California to testify at defendant's trial." (*Cogswell, supra*, 48 Cal.4th at p. 478.) Given the victim's repeated refusals to testify despite issuance of a valid subpoena, the court found it was "highly unlikely that had Lorene been taken into custody, she would have become a cooperative witness. . . . Having spoken directly to Lorene, the prosecutor was in the best position to assess the strength of her determination not to testify at defendant's trial. Based on that assessment, the prosecutor could reasonably conclude that invoking the Uniform Act's custody-and-delivery provision would not have altered Lorene's decision not to testify again about the sexual assault, and thus it would have been a waste of time and resources." (*Id*. at p. 479.)

We reach the same conclusion here, finding that "confinement of a sexual assault victim to ensure her presence at the assailant's trial would . . . not be a reasonable means of securing the witness's presence." (*Cogswell, supra*, 48 Cal.4th at p. 479.) Numerous individuals from the district attorney's office and the LAPD called and visited Debra as soon as she began refusing to come to court and continued their efforts multiple times over the course of three days, attempting to address her concerns and convince her to testify against appellant at trial. They also made the same pleas to Debra's stepfather, explaining the importance of her testimony to the case. When they could not locate Debra, they continued to attempt to reach her by phone, through her building's employees, her stepfather, and at her child's daycare center. Despite these attempts, Debra repeatedly stated that she would not testify again, becoming visibly upset and stating that she did not want to be in the same room as

23

appellant. She also took steps to avoid further contact with the prosecution, refusing to answer her phone or come to the door, and sending someone else to pick up her child from daycare. Under these circumstances, we agree with the trial court's conclusion that the prosecution exercised due diligence in its efforts to secure Debra as a trial witness. After repeated attempts to convince Debra, "the prosecutor was in the best position to assess the strength of her determination not to testify." (*Cogswell, supra*, 48 Cal.4th at p. 479.) Moreover, it was not error for the trial court to find under *Cogswell* that the drastic step of taking Debra into custody and transporting her to court was not necessary to demonstrate due diligence.

We are not persuaded otherwise by appellant's assertion that simply because Debra lived in California, taking her into custody, bringing her to court, and forcing her into the same room as her assailant would involve "relatively minimal (compared to *Cogswell*) effort or trauma to the victim." Appellant's suggestion that the rationale of *Cogswell* is only applicable to "a truly extreme case" is belied by the language of that decision and is not supported by citation to any authority. The prosecution here presented evidence of extensive efforts to persuade Debra to testify, which were met with absolute resistance from the witness. The trial court was entitled to rely on the prosecution's assessment and did not err in concluding that forcing an already upset sexual assault victim to come to court was unwarranted and unlikely to produce her cooperation.

Appellant also contends that the trial court erred in denying his request for a conditional examination of Debra pursuant to section 1336. "In all criminal cases, 'other than those for which the punishment may be death' (§ 1335, subd. (a)), the

prosecution may apply for a court order compelling a material witness to submit to a conditional examination if the witness 'is about to leave the state, or is so sick or infirm as to afford reasonable grounds for apprehension that he or she will be unable to attend the trial, or is a person 65 years of age or older, or a dependent adult' (§ 1336, subd. (a).)" (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1519.)  The party requesting the conditional examination must submit an affidavit stating, among other things, that "the witness is about to leave the state, or is so sick or infirm . . . that he or she will not be able to attend the trial. . . ."  (§ 1337, subd. (d)(1).)  During the conditional examination, the defendant has the right to be present with counsel.  (§ 1340, subd. (a).)

We find no error in the trial court's refusal to order a conditional examination of Debra during trial. In his opening brief, appellant cited no authority supporting his contention that a conditional examination could be employed where a sexual assault victim has been declared unavailable mid-trial.  In reply, he cites *People v. Foy* (2016) 245 Cal.App.4th 328, 341-342 as support.  "Obvious reasons of fairness militate against our considering this poorly developed and untimely argument." (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10.) Moreover, appellant's belatedly-cited case is inapposite.  In *People v. Foy, supra*, at pp. 328, 339-340, a conditional examination was taken over a month *before* trial because the witness to a robbery had moved out of the state. In addition, it was not error for the court to conclude that Debra would have been just as unwilling to testify during a conditional examination as she would have at trial, particularly given appellant's presence.

II.    *CALCRIM No. 1191B*

Appellant contends the trial court erred by instructing the jury that it could use a charged sexual offense to find a propensity to commit sexual offenses, based on a modified version of CALCRIM No. 1191B.  Based on this instruction, he asserts that the jury might have found he committed one of the charged offenses beyond a reasonable doubt and then "bootstrapped" that finding to convict him of other offenses without making the requisite finding that he committed each offense beyond a reasonable doubt.  We find no error.

A.    *Background*

The trial court instructed the jury with a modified version of CALCRIM No. 1191B as follows:  "[The] People presented evidence that the defendant committed the crime of Rape as charged in Count One through Four.  [¶] If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offense charged in this case.  [¶] If you find that the defendant committed one of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the other crime.  The People must still prove each charge beyond a reasonable doubt."  Defense counsel did not object to the instruction.

B.    *Legal framework*

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is

26

generally inadmissible to prove a person's conduct on a specified occasion." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159 (*Villatoro*), citing Evid. Code, § 1101, subd. (a).) However, the Legislature has created a specific exception to the rule against admitting character evidence in cases involving sexual offenses. (Evid. Code, § 1108, subd. (a) (§ 1108(a)); see also *Villatoro, supra*, 54 Cal.4th at p. 1159.)

As relevant here, section 1108(a), provides, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." "Enacted in 1995, section 1108 'implicitly abrogates prior decisions of this court indicating that "propensity" evidence is per se unduly prejudicial to the defense.'" (*Villatoro, supra*, 54 Cal.4th at p. 1160, quoting *People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).)

In *Villatoro, supra*, 54 Cal.4th at p. 1160, our Supreme Court considered whether section 1108 permitted using evidence of other *charged* sexual offenses as well as *uncharged* offenses. The court concluded that it did, reasoning that "nothing in the language of section 1108 restricts its application to uncharged offenses. Indeed, the clear purpose of section 1108 is to permit the jury's consideration of evidence of a defendant's propensity to commit sexual offenses." (*Id.* at p. 1164; see also *Falsetta, supra*, 21 Cal.4th at p. 915 ["[C]ase law clearly shows that evidence that [a defendant] committed other sex offenses is at least circumstantially relevant to the issue of his disposition or propensity to commit these offenses."].) Thus, the court concluded: "In light of this clear purpose, we perceive no reason

27

why the Legislature would exclude charged sexual offenses from section 1108's purview, and no indication that it did so in either the text of section 1108 or its legislative history. Whether an offense is charged or uncharged in the current prosecution does not affect in any way its relevance as propensity evidence." (*Villatoro, supra,* 54 Cal.4th at p. 1164.)

C. *Analysis*

Appellant contends that instructing the jury with CALCRIM No. 1191B violated his due process rights. Preliminarily, respondent argues that appellant forfeited this argument by failing to object at trial. Failure to object to instructional error forfeits the issue on appeal unless the error affects a defendant's "substantial rights." (§ 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7; *People v. Felix* (2008) 160 Cal.App.4th 849, 857.) The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Arredondo* (1975) 52 Cal.App.3d 973, 978.)

Here, appellant argues that the purported instructional error implicates his substantial rights; moreover, to the extent that his counsel's failure to object worked a forfeiture, he contends that his counsel rendered ineffective assistance. We address his contentions on the merits to determine whether there was an impairment of his substantial rights or ineffective assistance of counsel. (See *People v. Felix, supra,* 160 Cal.App.4th at p. 858; *People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)

Appellant's contention that CALCRIM No. 1191B lowered the prosecution's burden of proof is squarely foreclosed by the holding in *Villatoro, supra,* 54 Cal.4th 1152. There, the court

considered and approved a modified version of CALCRIM No. 1191B substantially similar to the one given here. (*Id*. at p. 1167.) The court concluded that "the instruction clearly told the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity. Thus, there was no risk the jury would apply an impermissibly low standard of proof." (*Id*. at p. 1168.) Indeed, the *Villatoro* court expressly rejected the suggestion appellant raises here that the jury might not be able to engage in the "mental gymnastics" required to understand the applicable burden of proof. (*Ibid*.) Thus, the court concluded that "[t]he modified version of CALCRIM No. 1191 did not impermissibly lower the standard of proof or otherwise interfere with defendant's presumption of innocence." (*Ibid*.)

Appellant acknowledges *Villatoro*, but appears to suggest that we follow the dissent. We are bound to follow the Supreme Court's decision. (*People v. Johnson* (2012) 53 Cal.4th 519, 527-528; *Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.) Appellant's claim of unfairness here parallels the objections of the dissenters in *Villatoro* that the instruction would permit the "bootstrapping of verdicts" and the possibility that the jury might "'simply conclude that because it found the defendant guilty of one count, he must be guilty of the others.'" (*Villatoro, supra,* 54 Cal.4th at pp. 1170, 1175, 1179, conc. & dis. opn. of Corrigan, J.) However, the majority disagreed, concluding that the instruction "did not permit the jury to convict defendant of one count based simply on its guilty 'verdict' on any other counts. [Citation.] It is not the verdict itself, but rather the jury's factual finding that defendant has committed a sex offense, that the jury relies on to draw an

29

inference of disposition or propensity." (*Id*. at p. 1165.) The court also noted that the instruction, like the one given here, "affirmed that evidence that the defendant committed a charged offense 'is not sufficient by itself to prove the defendant is guilty of another charged offense.'" (*Ibid*.)

Appellant also argues that the admission of propensity evidence was unduly prejudicial, citing Evidence Code section 352. But apart from his general objection over the use of a charged offense under section 1108, appellant has not articulated any error by the trial court based on Evidence Code section 352 in admitting evidence of two similar attacks that occurred only two days apart. (See *Villatoro, supra*, 54 Cal.4th at pp. 1168-1169 [finding that evidence of two similar attacks "was highly probative of defendant's propensity to commit such crimes, and its value substantially outweighed any prejudice"].)[6]

III.    *Admission of Hearsay Statements*

Appellant argues that the court erred in admitting the reports of the sexual assault examinations conducted by nurse practitioners Stotts and Adler because they contained "highly prejudicial hearsay." Specifically, he objects to the portion of the reports containing statements made by the victims. We conclude that even if the reports were admitted in error, any error was harmless.

A.    *Factual Background*

During trial, both Stotts and Adler testified that they completed a state-mandated form as part of their sexual assault

---

[6] Because we find no error, we need not address appellant's contention that his attorney's failure to preserve this claim constituted ineffective assistance of counsel.

30

examination protocol. These forms included a sexual assault history of the patient, which Stotts and Adler testified that they used to guide the subsequent physical examination and also to assist them in reaching an opinion as to whether the examination results were consistent with what the patient reported.

When the prosecutor began to question Stotts regarding the form she completed for Emily, defense counsel objected "on the grounds of hearsay as to anything said by the victim." He argued that the report included a narrative of what the victim said had occurred and that it was no "different than a police report which is typically objectionable as hearsay." The prosecutor countered that the statements were "used by the expert in order to guide her . . . medical examination. And she also used it to form her opinion that the exam was consistent with the history, and that is a non-hearsay purpose for these statements." The court ruled that the evidence was admissible because it was "not really offered for the truth of the matter; it's offered for how the expert then conducts the examination and reaches an opinion. And you can even cross-examine her on the point that she doesn't know whether the patient is telling the truth." Defense responded "ok" and questioning continued.

Later, during her testimony, Stotts acknowledged that it was not her job to judge if what the patient told her was true. She also testified that the primary purpose of the sexual assault examination was to gather evidence to give to the police. The custodian of records for the Santa Monica rape treatment center also testified that the forms were used to collect evidence for law enforcement purposes.

Defense counsel did not object when the prosecutor questioned Adler regarding the form she completed for Debra's

31

examination.  However, at the close of evidence, defense counsel objected to the admission of both forms into evidence.  He again asserted hearsay grounds, arguing that the forms were "akin to a police report" and "clearly intended for law-enforcement purposes, not for treatment or diagnosis."  The prosecutor reiterated that the statements were offered for a non-hearsay purpose as the nurse practitioners used them to "guide their examination as well as to conclude whether or not the exam is consistent with the history."  The court overruled the objection, but stated that it would instruct the jury on the limited purpose of the evidence and that defense counsel was free to argue that the "experts' opinions aren't reliable because the information that was given to them is not true."

The jury was instructed that the relevant exhibits "contain alleged statements from Emily [ ] and Debra [ ] made to a Nurse Practitioner at the time of a sexual assault examination.  Those statements are not offered for their truth, but rather to show the basis for any opinions expressed by the nurse practitioner."  The jury was also instructed that it could consider that evidence only for that purpose and "for no other."

B.    *Legal Standards*

Appellant contends that the sexual assault examination reports were inadmissible hearsay and should have been excluded.  Respondent asserts that the reports were admissible as business records under Evidence Code section 1271.

A trial court's ruling on the admissibility of evidence, including one that turns on the hearsay nature of the evidence, is reviewed under the abuse of discretion standard.  (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)  Hearsay is "evidence of a statement that was made other than by a witness while testifying

32

at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless it falls under an exception. (*Id.*, subd. (b).)

Pursuant to Evidence Code section 1271, certain business records can be excepted from the hearsay rule. Admissible business records are those "writings made in the regular course of business, at or near the time of the event, and created through sources of information and a method of preparation reflecting its trustworthiness." (*People v. Sanchez* (2016) 63 Cal.4th 665, 695, fn. 21 (*Sanchez*).) However, when a business record "is not made to facilitate business operations but, instead, is primarily created for later use at trial, it does not qualify as a business record." (*Ibid.*, citation omitted.)

Documents may also contain several layers of hearsay. "An emergency room report, for example, may record the observations made by the writer, along with statements made by the patient. If offered for its truth, the report itself is a hearsay statement made by the person who wrote it. Statements of others, related by the report writer, are a second level of hearsay. Multiple hearsay may not be admitted unless there is an exception for each level." (*Sanchez*, supra, 63 Cal.4th at p. 675.)

C.    *Analysis*

We are not persuaded that respondent has established the admissibility of the reports as business records. First, the testimony by Stotts, Adler, and the custodian of records suggested that the state-mandated forms were generated primarily for law enforcement purposes and use as evidence in a court, rather than as a medical record, which may disqualify them as business records. (See *Sanchez, supra*, 63 Cal.4th at p. 695, fn. 21; *People v. McVey* (2018) 24 Cal.App.5th 405, 415

33

[police reports were not subject to business records hearsay exception because "'the regularly conducted business activity is the production of evidence for use at trial'"], quoting *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 321.)

Second, the findings and observations of the nurse practitioners recorded on the forms constituted only the first layer of hearsay. Respondent ignores the fact that the statements the victims made to Stott and Adler, which they in turn recorded on the forms, made up a second, distinct layer of hearsay for which an independent hearsay exception was required. (*Sanchez, supra*, 63 Cal.4th at p. 675.) Respondent offers no grounds apart from the business records exception to admit the victims' statements. However, as we discuss *post*, any error in admitting these statements was harmless.

We note that even where hearsay is properly admitted pursuant to an exception for purposes of state law, it may nonetheless violate the Sixth Amendment's confrontation clause. (*Crawford v. Washington* (2004) 541 U.S. 36, 53-54 (*Crawford*) [holding that the admission of testimonial hearsay violates the confrontation clause unless the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine the declarant].) Appellant made a passing reference to "confrontation" in his appellate briefing, but did not properly raise the argument on appeal that the admission of the victims' statements violated *Crawford*.

Moreover, appellant did not properly preserve an objection on this basis at trial. Instead, defense counsel objected only on the basis that the statements were hearsay; neither counsel nor the court raised the issue of a federal constitutional violation. Thus, we conclude that even if he had properly raised it on

34

appeal, appellant would have forfeited this claim. (*People v. Redd* (2010) 48 Cal.4th 691, 730–731 [the defendant "did not raise an objection below based upon the confrontation clause, and therefore has forfeited this claim"]; *People v. Raley* (1992) 2 Cal.4th 870, 892 [hearsay objection did not preserve confrontation clause argument for appeal], superseded by statute on other grounds as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 63, fn. 8; see also *People v. Holmes* (2012) 212 Cal.App.4th 431, 435–436 [confrontation clause objection preserved only "where ... the context makes clear that the court and opposing counsel were aware that the confrontation clause was the basis of the hearsay objection"].)

Because appellant has not preserved an objection based on a federal constitutional violation, any error in admitting the sexual assault reports at trial is an issue of state law only and is subject to the harmless-error analysis under *Watson, supra*, 46 Cal.2d at p. 836. (*People v. Leach* (1975) 15 Cal.3d 419, 445.) Under this standard, we reverse a conviction only where "it is reasonably probable that a result more favorable to [the defendant] would have been reached in the absence of the error." (*Watson*, *supra*, at p. 836.)[7]

Here, it is not reasonably probable the jury would have reached a different result had the court excluded the sexual assault examination reports, particularly the victims' statements during the examination. Emily testified in great detail regarding the assault by appellant, and Debra's preliminary testimony was read at trial. The central details provided by both women of the

_____

[7] Indeed, given the strength of the evidence here, we would find any error harmless under any standard.

incidents were corroborated in multiple ways—other witnesses (both civilian and police) confirmed that Emily and Debra had reported being assaulted and raped that night, Emily contemporaneously sent text messages to her friend with the same statements, photographs of their injuries matched their descriptions of the incidents, and genital swabs taken from both victims revealed semen containing appellant's DNA. Moreover, both women independently identified appellant as their assailant and described similar incidents, bolstering the credibility of each victim's account, as there was no indication they had ever met. Indeed, even absent the victims' statements, the nurse practitioners' testimony regarding their observations of the victims' injuries further supported the convictions. Thus, any error was harmless.

IV.    *Sentencing*

Appellant contends the matter must be remanded for resentencing because the trial court "failed to afford mitigating weight to appellant's youth." We disagree.

A.    *Factual Background*

At the sentencing hearing, the trial court indicated it had read and considered the prosecution's sentencing memorandum, the probation officer's report, and the Static 99 R assessment report, which it described as a "diagnostic tool that is utilized to predict future dangerousness of a defendant who is accused of committing sexually violent offenses." The court stated that appellant was assessed at "a level 7 which is well above average risk to re-offend. . . . I will say that in all of the Static 99 reports that I have seen over the years, this is the highest number that I've ever seen in a report of this nature. And it speaks to the dangerousness of Mr. Cousin[ ] and his likelihood to re-offend if

36

given the opportunity."

Defense counsel asked the court to consider factors including appellant's age and family circumstances at the time of the incidents. Appellant was 19 at the time he committed the rapes. Defense counsel also argued that the victims were "not normal" victims because "one of them is a prostitute" and the other was involved in "the use of drugs," and therefore the circumstance of the offenses were "somewhat different than if this was just a willy-nilly rape of a person out on the street." The court rejected this argument as "incredibly offensive . . . and offensive to women, all women, including myself and the other women that are in this courtroom."

When imposing appellant's sentence, the court stated that "there are 18 year-olds and there are 18 year-olds. And the defendant that I see before me in court has been no stranger to the criminal justice system over the years." The court noted that there had been unsuccessful efforts to rehabilitate appellant as a juvenile and that he had already incurred multiple convictions as an adult. Additionally, the court found that although appellant may have experienced adverse circumstances in his life, he "has apparently decided that that entitles him to . . . victimize whomever he wishes to. And he does that on a fairly consistent basis. [¶] And he's a big guy. . . . And these women were no match for him and his forcible conduct." The court noted the very high risk based on the assessment tool that appellant would continue to commit "offenses of this nature in the future and victimize other women."

The court acknowledged that appellant's age was the only possible mitigating factor, but concluded that, "considering the sophistication and the dangerousness that he's displayed, it

37

doesn't seem to be a mitigating factor here." Further, the court found that aggravating circumstances clearly outweighed the mitigating circumstances, based on the vulnerability of the victims, the violence involved, the failure of other efforts, including appellant's failure to comply with the terms and conditions of probation, and the increasing seriousness of his crimes, all "indicate that increased penalty is appropriate." However, the court noted that appellant could be entitled to an early parole hearing because of his age and could potentially earn an early release "if he is able to change his life around."

B. *Analysis*

Appellant argues that the court was required to account for his youth[8] when determining his sentence but refused to do so. He further contends that the resulting imposition of a sentence of 70 years to life plus 16 years is the functional equivalent of life without parole and thus constitutes cruel and unusual punishment in violation his Eighth Amendment rights.

Appellant relies on a line of cases holding that the law requires children to be treated differently from adults for sentencing purposes, including *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*), *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*). In *Graham*, the Unites Stated Supreme Court held that sentencing a juvenile to life without the possibility of parole for a nonhomicide offense

---

[8] We note that in his appellate briefing, appellant alternately contends that he was 18 or 19 years old at the time of the offenses; the evidence in the record demonstrates that he was 19.

38

violates the Eighth Amendment's prohibition of cruel and unusual punishment. (*Graham, supra*, 560 U.S. at p. 79.) The court noted the "fundamental differences between juvenile and adult minds" and that juveniles are "more capable of change than are adults." (*Id.* at p. 68; see also *Miller, supra*, 567 U.S. at p. 479 ["the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders"].) In *Caballero, supra*, 55 Cal.4th at p. 268, the California Supreme Court applied these principles to hold that an aggregate determinate sentence of over 100 years violated *Graham's* requirement that "a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime." The court also laid out specific mitigating circumstances that must be considered by a sentencing court before determining at what point juveniles can seek parole, including their age and their physical and mental development. (*Id.* at pp. 268-269.)

This line of cases does not apply to appellant, who was over 18 at the time of the offenses. He argues that the rationale should still apply because he was "indistinguishable from a 'juvenile'" with respect to brain development. This argument has repeatedly been made and rejected. While "[d]rawing the line at 18 years of age is subject . . . to the objections always raised against categorical rules . . . [, it] is the point where society draws the line for many purposes between childhood and adulthood." (*Roper, supra,* 543 U.S. at p. 554.) Moreover, the age of 18 "is the line the high court has drawn in its Eighth Amendment jurisprudence." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1380; see also *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 ["Making an exception for a defendant who committed a crime

just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood.  Such arguments would have no logical end, and so a line must be drawn at some point."].)

Appellant acknowledges this "bright line" but argues that we should ignore it and apply the same consideration as in *Graham* and its progeny to his case.  We cannot. (*People v. Johnson, supra,* 53 Cal.4th at pp. 527-528.)  Because appellant was over 18 years of age at the time of the offenses, we conclude that his sentence is not cruel and/or unusual under *Graham*, *Roper*, *Miller*, or *Caballero*.

### DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


MANELLA, P. J.


CURREY, J.


40